

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**
JUN 1 4 2019
ARTHUR JOHNSTON
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF MISSISSIPPI

**ALVIN SHOWERS III**

**CIVIL ACTION**

**VS.**

**CASE NO.**

1:19cv323 LG-RHW

**CITY OF BAY ST. LOUIS**
**BAY ST.  LOUIS POLICE DEPARTMENT,**
           **MICHAEL A. -DeNARDO, INDIVIDUALLY AND**
  **AS FORMER POLICE CHIEF BAY ST. LOUIS,**
**GARY PONTHIEUX, INDIVIDUALLY AND AS**
  **POLICE CHIEF, BAY ST. LOUIS,**
**LES FILLINGAME, INDIVIDUALLY AND AS**
  **FORMER MAYOR, BAY ST. LOUIS, AND**
**MICHAEL FAVRE, CURRENT MAYOR, INDIVIDUALLY**
  **AND MAYOR**
**JEFFREY HENDRIX, INDIVIDUALLY AND AS**
  **POLICE OFFICER, BAY ST. LOUIS,**
**PUSH PHILLIPS, INDIVIDUALLY AND AS**
  **POLICE OFFICER, BAY ST. LOUIS,**
**PAUL TAYLOR, INDIVIDUALLY AND AS**
  **POLICE OFFICER, BAY ST. LOUIS,**
**JAMES BURCH, AS FORMER DIRECTOR**
  **NARCOTICS TASK FORCE,**
 **BAY ST. LOUIS**
**RICKY ADAMS, AS SHERIFF OF HANCOCK COUNTY**
  **AND AS ACTING CHIEF OF POLICE, BAY ST. LOUIS,**
**KEVIN GARY, FORMER TENANT AND INFORMANT**
  **FOR BAY ST. LOUIS POLICE DEPARTMENT,**
**MILES MORAN, FORMER TENANT AND INFORMANT**
  **ACTOR FOR THE BAY ST. LOUIS POLICE DEPT., AND**
**BRANDON FARVE, CO-PARTICIPANT WITH TENANTS**
**AND WESLEY MALLEY, ACTING POLICE CHIEF, BAY**
**ST. LOUIS POLICE DEPARTMENT, INDIVIDUALLY AND**
**IN OFFICIAL CAPACITY AND ABC INSURANCE CO.**
**ERIC DEANGELO, PRIVATE SECURITY COMPANY OWNER**
**ACTING FOR BAY ST. LOUIS POLICE DEPARTMENT**

**SECTION:**
**JURY TRIAL**
**REQUESTED**

1

## COMPLAINT

### 1.

### NATURE OF THE ACTION

This is an action for money damages, compensatory damages, punitive damages, and injunctive relief brought pursuant to 42 USC Section 1983, 1988, violations and deprivations of constitutional rights under color of state law pursuant to the Fourth Amendment, First and Fifth Amendments through the Fourteenth Amendment of the United States Constitution, the laws of the state of Mississippi and for defamation of character and other torts and injuries therefrom against the defendants in their official and individual capacities.

### 2.

### JURISDICTION AND VENUE

This Court has jurisdiction of this cause under 28 USC 1331 and 1343. Venue is proper pursuant to 28 USC Section 1391 in that the Defendants and the Plaintiff reside in the jurisdiction of this Court, and the cause of action arose within the Southern District of Mississippi.

### 3.

### PARTIES

a.  The Plaintiff, Alvin Showers, III is a competent adult person who resides in Bay St. Louis, MS. and is a natural born citizen of the United States of America.

b.  The defendant, former chief of police, Michael DeNardo, THROUGH DEFENDANT, CITY OF BAY ST LOUIS, AND BAY ST. LOUIS POLICE DEPARTMENT, was an adult person who resided in Bay St. Louis, MS. at all relevant times herein.

2

c. The defendant, Ricky Adams, Hancock County Sheriff, is a competent adult person, who acted in the capacity of acting chief of police, Bay St. Louis at certain relevant times herein.

d. The defendant, Jeffrey Hendrix, Bay St. Louis police officer is a competent adult person, who was at all times herein acting individually and in his capacity as police officer.

e. The defendant, Push Phillips, Bay St. Louis police officer is a competent adult person, who was at all times herein acting individually and in his capacity as police officer.

f. The defendant, Paul Taylor, Bay St. Louis police officer is a competent adult person, who was at all times relevant herein acting in individual and official capacities.

g. The defendant James Burch is a competent adult person, who at relevant times herein acted officially as former director of Bay St. Louis Narcotics Task Force.

h. The defendant Gary Ponthieux is a competent adult person, who at relevant times herein acted in official capacity as Bay St. Louis Police Chief.

i. The defendant Les Fillingame is a competent adult person, who at relevant times herein acted in his capacity as Mayor of the city of Bay St. Louis.

j. The defendant Kevin Gary is an adult person, who was a tenant at some relevant times, but who acted for and on behalf of the Bay St. Louis Police Department at relevant times herein.

k. The defendant Miles Moran is an adult person, who was a tenant at some times relevant, but who acted for and on behalf of the Bay St. Louis Police Department at most relevant times herein.

3

1. The defendant Brandon Farve is an adult person, who was a companion of or with the named tenant defendants herein, in acting with and for the Bay St. Louis police department.

## 4.

## CLAIMS

*Introductory Facts:*

1. The Plaintiff, Alvin Showers III is a citizen in the Bay St. Louis, MS community, residing in a prominent beach area of the city for many years, and who was for more than thirty years a valued and trusted news journalist with one of the local television stations in South Mississippi.

2. However on June 14, 2016 Mr. Showers lost his long term career, after certain defendants conspired with other defendants to discredit Mr. Showers, assassinate his character and reputation by causing to be disseminated, disseminating and conspiring to disseminate the false allegation that Mr. Showers was "mentally impaired" to the extent that the defendants determined Mr. Showers needed to be involuntarily committed to a local psychiatric facility—and these defendants, specifically defendant Police Chief Michael DeNardo, in conjunction and conspiracy with department police officers-defendants Jeffrey Hendrix, Push Phillips and Paul Taylor took egregious measures that led to the involuntary commitment to Mr. Showers to a local facility on June 14, 2016. Defendants failed to comply with Mr. Showers'

4

due process rights, nor did they adhere to laws and regulations of the State regarding "involuntary commitment process or procedures."

3.  Two Hancock county Sheriff's Deputies simply showed up at Mr. Showers' home, removed him from his home in hand cuffs, arrested him and took Mr. Showers to a phychaitric facility, against Mr. Showers 'will. Without allowing Mr. Showers to contact any family, friends, or his employer—a TV station where Mr. Showers satisfactorily worked 32 plus years as a producer and as a Newscaster covering stories in South Mississippi and its market neighbors.

4.  Mr. Showers contends that the above defendants were acting individually and in their official capacities as officers of the defendant, City of Bay St. Louis—under color of law.

5.  Further Mr. Showers contends that these defendants committed numerous legal violations in the process of forcing him into a psychiatric facility, including violating state laws which prescribe the process and procedures for involuntary commitment.  Defendant failed to adhere to the protective rights of Mr. Showers in this process in several ways, specifically, that defendants had no credible, reasonable medical evidence upon which to forceably commit Mr. Showers to any psychiatric facility—then or at any relevant time.

6.  By executing this illegal writ of involuntary commitment, defendant chief DeNardo in conjunction with defendant, Hancock County Sheriff, Ricky Adams all these defendants defamed and assassinated the character of Mr. Showers by falsely alleging that Mr. Showers was "in need of treatment and *confinement* allegedly consistent with Mississippi state law, Section 41-21-67 of the Mississippi Code Annotated.

7.  Prior to obtaining the order of commitment, defendants DeNardo, defendant, Ricky Adam, Sheriff's Deputies detained Mr. Showers at his home, placed Mr. Showers under

arrest, and then took Mr. Showers into custody at the psychiatric facility to which Mr. Showers was immediately involuntarily committed on the words of these named defendants.

8.    These defendants, among other violations of law and policies failed to follow the very specific mandates of the Mississippi Code regarding involuntary commitment regarding his due process rights and violated Mississippi's Best Practices policies of requiring committing officers to have obtained Crisis Intervention Training when dealing with alleged mental health patients.  None of the committing officers were duly qualified in this case.

9.    As a matter of fact, the Bay St. Louis Police Department, failed, as a matter of policy in that it had no Crisis Intervention Policies in place in this instance and in all other instances.

10.   Defendant officer Jeffery Hendrix, along with former police chief DeNardo made medically unsubstantiatable and uncorroborated conclusions from their perceived observations of Mr. Showers days before the commitment that Mr. Showers was on "drugs" and appeared to be mentally impaired.

11.   Neither of these defendants had any prior training or background to have reached such a conclusion, not to mention, to have acted upon their observations, UNDER COLOR OR LAW, as they did.

12.   Within 15 minutes of Mr. Showers forced placement at CSU, he was drug tested and he tested negatively for all illegal drugs as he is not a drug user or alcohol abuser.

13.   Prior to taking Mr. Showers into custody to the psychiatric facility, defendants DeNardo and defendant officers, Push and Taylor made an illegal search of Mr. Showers' home

and premises—having no warrant, and having provided no reason or cause to believe that criminal activity was taking place at the time of the search.

14.  Mr. Showers was illegally confined to the psychiatric facility more for than three (3) weeks and under any circumstance, long enough to lose his long standing, revered by the community career for breach of contract by abandoning his employment—a precondition which was reasonably expected but was given no deferential treatment by these defendants at the time of their, wrongful, illegal, and detrimental extreme and causeless actions herein described.

15.  In Mr. Showers' capacity as a TV News Journalist-Reporter for South Mississippi he was engaged in political news casting and investigation as part of his duties.

16.  About one (1) month prior to defendant DeNardo's and the named defendant police officers above involuntary commitment of Mr. Showers, Mr. Showers was working on one or more stories involving allegations of illegal activity in the Bay St. Louis police department, specifically looking at possible illegal activity by the defendant police chief, DeNardo, including claims of possible "money losses or misuses" among other aspects.

17.  Mr. Showers contends that defendant DeNardo was aware that Mr. Showers was doing journalistic investigations which were asking tough questions about "illegal activities" of the police chief because Mr. Showers had made contact with the defendant DeNardo on DeNardo's cell phone on at least one occasion where a brief discussion between the two is likely to have taken place.

***Other Introductory Facts of police officer negligence and violations of civil rights:***

Mr. Showers claims that starting around May 9, 2016 he had to call 911 police emergency for law enforcement assistance when he realized that there were intruders who were trying to gain access

to his property, and who in fact did manage to get into Mr. Showers' home via the back of the house's marsh area, the large tree limbs, and Mr. Showers' wide beach front balcony.

18.     Initially Mr. Showers did not have any indications as to who these intruders were or why they were trying to break into his home, but he knew he needed police protection and assistance in detecting and arresting these lawbreakers.

19.     Therefore, each time Mr. Showers heard them attempting to get into his home, or o his balcony, he called 911. These break-ins were taking place when Mr. Showers was at home. He was extremely threatened for his life.

20.     Defendant officer responded to Mr. Showers' 911 calls regarding the theft of the commercial grade of his security system, *only, but did nothing of an investigatory nature to determine the suspect.*

21.     Officer Hendrix came onto the premises, made a cursory review outside the premises and based on this review he told Mr. Showers that there were no intruders on the premises. Hendrix took no further investigatory action, left Mr. Showers' home.

22.     Hendrix made no investigatory action of any kind, contact with the tax-paying community accountability.

23.     Before defendant Hendrix left the premises, Mr. Showers attempted to show defendant Hendrix where the intruders may have been hiding, how they may have gained access to inside his home and Mr. Showers even tried to tell defendant Hendrix what Mr. Showers believed was going on by and with these intruders, and it was illegal drug activity, Mr. Showers believed—but no police report concerning these mattes were taken.

24.     Mr. Showers attempted to show defendant police officers Hendrix, Taylor and Phillips evidence of 'foot prints' near Mr. Showers' back yard marsh, evidence of someone stepping onto the second level balcony from the exterior of the house and even illegal drug paraphernalia that Mr. Showers found on his premises, again to no avail.

25.     None of the defendant police officers were interested in conducting an investigation of Mr. Showers' home and premises, nor in conducting any type of testing on drug paraphernalia, foot prints or hand/finger prints found by Mr. Showers on his balcony around the same time as Mr. Showers heard the intruders and called 911.

26.     In lieu of conducting a police investigation of the premises, as was the duty of defendant officers Hendrix, Phillips and Taylor when they responded to the 911 call(s) by Mr. Showers, these defendants, especially defendant Hendrix decided that he, Hendrix, was qualified to make a medical opinion about Mr. Showers mental and emotional state of mind, disregarding Mr. Showers' apparent fears about intruders and their goals, Hendrix stated that Mr. Showers was "high", "sleep-deprived", "hyper" and "hallucinatory"—all of this by defendant Hendrix based on one encounter with Mr. Showers.

27.     Defendant Hendrix has 'no' qualifications which render him capable of making psychological mental assessments on first encounter with victims seeking police protection and assistance, and as with all the other officers, Hendrix was not CIT trained at the time of his misguided, defamatory statements of his alleged conclusions about Mr. Showers' mental status then, or now.

28.       Mr. Showers adamantly denied and rejected defendant officers' assessment—told

them that he did not get "high", was not "hallucinating" and that such assessment

in lieu of any investigation of any kind was not only offensive, it was defamatory

and it would injure Mr. Showers in his reputation as a veteran news reporter for

WLOX in Mississippi (South).

**_Restraint by Chief DeNardo_**

29.   Mr. Showers contends that the detainment, arrest, restraint and subsequent forced

commitment by defendant DeNardo was motivated by defendant DeNardo's need to

attempt to discredit Mr. Showers in his capacity as veteran news reporter for WLOX in

Mr. Showers' reported connection of DeNardo to alleged illegal activities regarding the

police department and ultimately the city of Bay St. Louis' budget mismanagement.

30.   DeNardo's false allegations in the forced commitment papers went so far as to classify

Mr. Showers as "suicidal", "drug-using" and "hallucinatory"—stemming from Hendrix's

initial false labeling in lieu of legitimate police investigation and in failure to have or

provide CIT training policies within the department per the state's best practices policies.

31.   None of the defendant officers were qualified to have reached the medical conclusions

they reached and then acted on, and Mr. Showers' contends that they were acting as law

enforcement officers in a conspiracy to discredit Mr. Showers' credibility regarding Mr.

Showers' initial investigation of DeNardo's subsequent, established criminal violations

in the police department at the time.

32.   Mr. Showers' career with WLOX spanned 32 years, and his reputation in the community

was solid, one of distinction for successful journalism, and always bringing the news that

mattered to the communities of South Mississippi with professionalism and trust.

33. Mr. Showers was embarrassed, humiliated, personally and professionally injured by the conspiracy among the police department members and the chief to discredit Mr. Showers before he could release his findings publicly.

34. Although Mr. Showers fought the commitment, by the time he succeeded in getting released, he had lost his career and his reputation was assassinated given the commitment and alleged circumstances put out by DeNardo and the police department of Bay St. Louis—under color of law.

35. Intruders continued to come and go in Mr. Showers' home because they knew the police department would take no action to catch them, arrest them or put them on trial.

36. Mr. Showers eventually identified some of the intruders to be former tenants at his home, defendant Kevin Gary, who was put out by Mr. Showers; Miles Moran, another former, disgruntled tenant put out by Mr. Showers, and one of their companions, Brandon Farve Miles Moran was wearing (an ankle bracelet) at the relevant times.

37. Mr. Showers provided this information to the Bay police department under DeNardo and contends that rather than arrest these individuals, or at least investigate them in connection with evidence, the defendant, DeNardo, used these individuals to assist and conspire with the city in allowing other intruders in addition to these intruders to come and go at Mr. Showers' premises at will—in a plan to stalk Mr. Showers and his home, to damage property at his home (as was the case) and to place Mr. Showers in fear of his safety and the safety of his property—his home—all in violation of both federal and state anti-stalking laws.

38. Mr. Showers found drug paraphernalia which the police department did not want to investigate, after Mr. Showers claimed that this paraphernalia belonged to and was used by the former tenants and their companion to the police officers.

*Random Illegal Searches of Mr. Showers' home*

39. Instead of conducting investigations of the areas where Mr. Showers told the defendant officers he heard intruders and saw evidence of intruders, the officers seized the opportunity to conduct "random, in bedroom searches of Mr. Showers' home"—areas where Mr. Showers had not complained about any problems at all, and the defendant officers would force Mr. Showers to stand outside, while they ravaged through his bedroom.

40. Mr. Showers contends that this pattern of conduct by the defendant police officers was further stalking of him and was designed to make Mr. Showers appear to be mentally impaired such that his investigation of the chief's illegal acts and reporting of same would not be credible to the community at large.

41. On at least two occasions when Mr. Showers called the police for help, the intruders were still on the premises of his home, and Mr. Showers told the officers the locations of where they were based on the noises and voices he could hear coming from those areas, *but when defendant officers arrived, they refused to investigate the areas designated by Mr. Showers at all, but instead went into other, undesignated by Mr. Showers, places within Mr. Showers' home.*

*Police Harassment, 24/7 Surveillance and use of cyber-stalking to "jam" his emails, his GPS and to hack into his telephone calls.*

**2016**

42. Mr. Showers contends that this united action by the police department was to sabotage Mr. Showers' reputation and to further the "stalking conspiracy" which was just beginning in 2016 at the time of Mr. Showers' illegal involuntary commitment was and is a continuing, ongoing pattern of police harassment until the present time by referencing the following non-exclusive and non-exhaustive time line of police harassment –stalking and cyber stalking, as well as the use of electronic devices to punish, harass and place Mr. Showers in fear of his life, safety and the safety of his home.

a. *24/7 Surveillance against Mr. Showers at his home in Bay St. Louis, MS AND at his work home in Mobile, Alabama from 2016 continuing through 2019 (this present moment).*

b. *Mr. Showers contends that this interstate action by law enforcement in two states violates federal statues which prohibit interstate stalking regarding conduct which places a victim in fear for his safety and that of his property.*

c. *Mr. Showers contends that in Bay St. Louis, on a daily basis, one and up to several police cars—both marked and unmarked drive up and down his street—night and day, at night flashing their lights unto his home—and that there is only one other person who lives on his street, post Katrina.*

d. *Law enforcement cars use Mr. Showers' drive way to drive into and back up out of multiple times per incident, having no legitimate law enforcement reasons to make use of his property to turn around on a two house street.*

e. *Mr. Showers knew and or recognized some of the defendant officers because he had, as newscaster, often, made "rides" with these officers on drug busts and other police stories about which he reported.*

f. *These defendants have been named in this case.*

g. *Also, in 2016 and 2017, Mr. Showers observed at least one occasion when defendant officer, James Burch in unmarked car, picked the intruder, defendant Brandon Farve*

h. *up after I discovered this intruder attempting to scale my balcony.*

i. *Most importantly, however, is the fact that it was on or about June 14, 2016 when Mr. Showers was illegally, involuntarily committed to the psychiatric unit, Crisis Stabilization Unit, in Gulfport, MS as has been presented in detail in other parts of this Complaint.*

**2017**

**Mr. Showers becomes aware that he is being followed by law enforcement, not known by name in some instances, but known by the vehicles they were using.** As an investigative journalist, Mr. Showers often went on "rides" with law enforcement in their cars—marked and unmarked and he was able to determine that he was being followed by some of these officers.

43. Mr. Showers establishes the following as a time-line of when stalking conduct became a conspiracy between the police department and his former tenants as follows:

a. *On more than one occasion Mr. Showers was aware that defendant, Bay St. Louis police officer, James Burch followed him throughout Mr. Showers' goings and comings for the entire day up to and including when Mr. Showers came home from the day's activities.*

b. *Defendant, Burch was not discreet in his patrolling of Mr. Showers. He made certain that Mr. Showers could see him because Burch kept his vehicle in close proximity to Mr. Showers at all times, so that it was clear to Mr. Showers that he was being followed.*

c. *Defendant, Burch had no legitimate police business for why he was following Mr. Showers the entire day and he was acting under color or law, that is orders from the police chief and or maliciously and negligently as an individual. In either instance Mr. Showers believes that Burch was acting in concert with other law enforcement officer defendants herein to "gang stalk" Mr. Showers.*

d. *On at least two occasions, Mr. Showers was followed when he visited a friend in Waveland, Ms., who also observed that "voices were coming from the woods near where Mr. Showers and his friend were standing, and police-car type lights were being directly reflected on Mr. Showers and his friends.*

e. *.Mr. Shower was prevented from going into the woods to see who may have been the culprit on these occasions, but later learned in the summer of 2017, when Mr. Showers called the police because there was a man, slumped over at his wheel, with a gun and alcohol visible in his car—that the Bay police response was that the man was rabbit hunting only, and they allowed the man to be prodded into moving on without arrest or detention. This happened near the same woods where Mr. Showers had previously been "lit up" by the lights of a police car. Mr. Showers took a picture of the individual and believes based on information and belief, that the individual was a "police officer". The incident occurred on Riverside Street, which is an adjoining street to Mr. Showers' home street.*

f. *Because there are only two houses, post Katrina on Mr. Showers street, he took great notice of the fact that on hundred or more occasion, cars that don't belong in that neighborhood would come pass his house, sometimes driving on the wrong side of the two lane neighborhood road, sometimes driving very slowly at*

*or near his house, and going down his street to a cul de sac, where there are no homes or businesses of any kind—back and forth, sometimes also using his driveway as a turn around point—all appearing to be unmarked and marked police vehicles—day and night, and all times of the day, often pausing at or near his home.*

g.   *Mr. Showers contends that his home was being "stalked" at these times.*

44.   In 2017, Mr. Showers asked the Hancock County Sheriff deputy if he would conduct a surveillance near his home, or on his street at night in an effort to detect, identify, and properly arrest the perpetrators who were burglarizing his home as well as the drivers of the numerous cars which constantly flooded his 2 home street day and night, and since this deputy generally patrolled the beach area near Mr. Showers' home Mr. Showers believed he could obtain effective assistance with a simple surveillance by law enforcement which was not in the Bay Police Department.. The officer agreed, but when he was called and asked to come at a time when the suspected intruders were actually present, the deputy declined to conduct the surveillance on Mr. Showers' home and street. The deputy gave Mr. Showers no plausible reason why he misled Mr. Showers into believing that he would and could easily conduct such a surveillance, but when called again, this deputy refused.

## 2018 and 2019:  HUGE YEARS FOR ELECTRONIC HARASSMENT BY NAMED DEFENDANT LAW ENFORCEMENT AND THEIR INFORMANTS.

45.   Mr. Showers becomes aware that his telephone and electronic devices are being tapped into and his conversations are being repeated to him by law enforcement officers under circumstances where there would be no other means for these law

**enforcement officers to have had specific, factual knowledge of the subject matter of Mr. Showers' telephone and email conversations.**

a.  *On almost a daily basis on Mr. Showers' computer and phone are hacked into. My prior email traffic sent from my computer with no problem is now these transmissions bounce back on a regular basis.*

b.  *If I attempt to make appointments outside my home or office, certain defendant law officers are at the appointed place when I arrive. For example, defendant, Burch routinely met me in the same area where I had not 10 minutes prior made appointments for the meeting.*

c.  *On other occasions, a Mississippi Narcotics Bureau officer met me in the exact seating area where I made an appointment to meet someone going into the place. He was there and seated two or three tables away from me.*

d.  *On almost every day now emails designated for me do not arrive, especially those emails which are responsive to my outreach for help with what is happening to me from other individuals who have been targeted for punishment and surveillance, electronic invasion into their lives, and daily reminders that their lives are not their own anymore. The emails do not reach me at all in 2018 and 2019.*

e.  *In 2018, my security camera system was hacked into and later stolen by whom Mr. Showers believes to be defendant, Eric D'Angelo—and whom Mr. Showers believed was working with some of the named defendant police officers as a confident informant.*

f.  *I had certain conversations with a couple of people about D'Angelo's presence on my premises and his alleged work on my computer system where he left several exposed*

*wires, and what that might mean, and the very next day, the entire system was stolen from my home.*

g.  *In 2018 I began taking pictures of the "police car theatre" which was on my street daily. I was able to obtain pictures of the blue line stickers as well as some license tag numbers. I believe that the constant surveillance, the following of me wherever I travelled, even between two states, and the electronic invasion into my electronic devises was police harassment, stalking and cyber-stalking consistent with a violation of federal and state laws regarding these matters.*

h.  *Mr. Showers believes he is a "targeted individual"—a term of art to explain victims of the crimes of gang stalking and electronic invasion, constant surveillance and disruption to their lives and their homes for many reasons, on of which Mr. Showers state which applies to him is/was the former chief of police, DeNardo efforts to discredit him in his investigation of the Bay Police Department budget issues and other alleged illegal conduct on the part of the former chief.*

**Malice of and by the former police chief against Mr. Showers.**

i.  *The former chief used the illegal involuntary commitment to show his malice against Mr. Showers after he, DeNardo learned from Mr. Showers' cell phone calls to DeNardo's business cell phone, that Mr. Showers was onto DeNardo's criminal activities and that Mr. Showers, a TV news journalist was likely to break the story any day.*

j.  *In his affidavit in support of his (DeNardo's) petition for commitment of Mr. Showers, DeNardo libeled and defamed Mr. Showers by labelling Mr. Showers as "hallucinatory, drug user, who was mentally impaired—a danger to himself or others" among other defamatory language.*

k. *Absent any corroborating medical documentation, DeNardo, as police chief of City of Bay St. Louis, pushed through commitment papers against Mr. Showers which Mr. Showers in detention for NO MEDICAL REASON, for 3 weeks.*

l. *In addition to Mr. Showers losing his job of more than 32 years as a TV journalist reporter in South Mississippi, Mr. Showers was humiliated, went into personal seclusion because he did not want to answer to his booming public/fan base about "what happened". Mr. Showers wanted to contain the defamation, but could not.*

m. *He lost his job. He was unemployed for a year and he had to borrow from family and friends to maintain his home and lifestyle.*

n. *DeNardo took this illegal action, as chief of police for City of Bay St. Louis, acting under color of law, and in deviation from the state's best practices regarding interactions with thought to be mentally impaired individuals by police and other officials.*

o. *It was intentional infliction of emotional distress for Mr. Showers and the cause continues to this date as set forth above—on a daily basis.*

46. In order to accomplish his goal of involuntary commitment of Mr. Showers, defendant DeNardo told the Chancery Clerk that Mr. Showers was mentally unstable, suicidal and or homicidal without ever citing to any corroborating evidence.

In retrospect, Mr. Showers contends that it was actually defendant DeNardo who was mentally unstable, suicidal and or homicidal as when the defendant was caught red-handed involved in illegal activity—payroll fraud, gun trafficking and or other wrong doing—defendant DeNardo killed himself at the Bay St. Louis police department facility, just after having allegedly been terminated from his position by then Bay St. Louis Mayor Les Fillingame.

*Mr. Showers' evidence of intrusions onto his property*

47. The Plaintiff installed numerous camera devices onto his property between 2016 and the present in an effort to detect the presence of intruders—which the Bay Police Department

refused to investigate or assist in investigation after defendants Hendrix and DeNardo assassinated his character, attempted to discredit him, and forcibly committed him to psychiatric institution.

48. Almost every time Mr. Showers connected his camera devices, after leaving home and returning, he found that the devices had been tampered with, disconnected, or altered technically such that he was unable to detect anything or anyone beyond shadows, and unidentifiable objects on the camera recordings.

49. These interferences were not normal technical deviations according to the devices designs and usages, but were the result with outside, deliberate interference and deliberate alterations to the cameras' technical use and purpose.

50. The camera interferences were technically designed to alter or cancel all but minor aspects of the captured intrusions' activity.

51. Again, Mr. Showers asked the defendant Bay Police Department to work with him via surveillance and patrol to detect who was interfering with his outside camera devices, and to arrest these criminals and bring them to trial. The Bay Police Department would not assist Mr. Showers.

52. Objects were captured on Mr. Showers' camera devices which he contends that police officers using their investigative techniques and knowledge could have assisted in identifying the objects and their source—to no avail, however.

53. After the defendants, DeNardo and the named police officers rushed to judgment to discredit Mr. Showers, Mr. Showers, a tax payer, was unable to receive any police assistance from either Bay Police Department or Hancock County Sherriff's office and

the intrusions became more numerous and the intruders more bold in their regular

occupancy on his premises than ever—raising Mr. Showers' fear level well past minor.

54. Mr. Showers then identified two of his previous tenants to the Bay police department as

individuals he saw come onto or run away from his home on one or more occasions:

defendants Miles Moran and Kevin Gary.

55. The Plaintiff asked the police department to explore and investigate these individuals to

determine their whereabouts at times when Mr. Showers stated that he had seen them

running away from his home.

56. These individuals were identified by Mr. Showers to the Bay Police department to have

been defendants' Miles Moran, Kevin Gary—both former tenants of Mr. Showers and

defendant Brandon Farve, a companion of one of the former tenants.

57. Mr. Showers told the Bay Police Department that he believed these individuals were

intruders and trespassers onto his property and that he believed that they were involved

in drugs and or other illegal activity at his home—which was why he kicked them out as

tenants, initially.

58. Mr. Showers told the Bay Police Department officers that he, Mr. Showers had found

evidence of drug usage on his property after having seen one of more of the defendants

named above escaping from his balcony or running from his home into the street on which

Mr. Showers lived—to no avail.

59. Mr. Showers also told the Bay Police department officers named herein that he believed

that the defendant former tenants all had criminal records involving burglaries and or

drug convictions for which some of them had actually served time—which is also why

he kicked them out from tenancy in his home.

60.  Despite providing identification of possible suspects and record evidence of their illegality involving drugs on his premises when they were tenants, defendants DeNardo, Hendrix, Phillips and Taylor apparently still refused to investigate Mr. Showers' report and evidence consistent thereto, which was puzzling to Mr. Showers—a seasoned news investigator and reporter of crime in the very city of Bay St. Louis over many years.

61.  As a news investigator and reporter of crime in Hancock County, Mr. Showers had often been with the police officers on the scene of a crime in order to capture the story from the closest angle possible—and he knew most of the police officers, especially those who worked on the Narcotics task force based on his veteran's status as a news reporter in the county.

62.  After being unsuccessful at getting the Bay St. Louis police department to investigate his reports of intruders into his home and onto his premises, Mr. Showers turned to the Narcotics task force division—asking for help because he had found evidence of drug usage such as needles on his premises after having seen and or reported the presence of an intruder.

*Another series of incidents revealed wider drug and illegal activity involving Mr. Showers' home*

63.  Mr. Showers lives on a street which is largely vacant other homeowners after Katrina because of his home's close proximity to the gulf shores beach, and surrounded by a marsh, there was very little traffic on his street for the two houses which occupy the street.

64.  Considering the absence of any business of any kind and the presence of only two homes, which are located at the beginning of the street and at the opposite end of the street, there was never substantial automobile traffic of any kind on his street—prior to Mr. Showers' complaints of intruders to the Bay police department, its officers, the Hancock County

Sherriff's Department and one of its officers, to the police chief, and others affiliated with the Bay St. Louis Police Department.

65. Nonetheless, at about the same time as Mr. Showers' was being denied police protection and investigation of his intruders/trespassers claim, simultaneously, Mr. Showers noted that automobile traffic was increasing to a substantial degree.

66. Since Mr. Showers had often travelled with or in conjunction with police officers including narcotics officers for reporting purposes, Mr. Showers knew the automobiles and identities of many of the undercover narcotics officers.

67. Even though the Bay police had turned him away regarding his complaints, attempted to discredit him by force commitment and called him a mental case, Mr. Showers began to notice that undercover narcotics officers' cars were travelling his street many times a day—passing his home and going to the end cul de sac, Riverside Street, and turning around slowly driving past his home, and this was occurring numerous times during the day and the night.

68. On one or more occasions Mr. Showers could identify the driver of one of the undercover cars former Narcotics Task Force Director, James Burch.

69. After making this connection as to one of the undercover officers driving up and down his street, Mr. Showers inquired and learned that four Bay St Louis Police officers, who were undercover narcotics agents had resigned and or were terminated relative to an investigation into an illegal non-profit company which had an account which was set up by the allegedly involved officers to raise money to allegedly purchase technological equipment which could interfere with, cancel or negate the type of camera devices Mr.

Showers possessed—in the name of and on behalf of an organization called: **The High Risk Warrants Foundation.**

70. This Mississippi formed and registered corporation was deemed to have been illegal in its purpose, but according to news sources, it had raised in excess of $600,000 to purchase property and other alleged 'quasi legal' equipment to be used to carry out *vigilante type justice* warrants, listening devices, hidden cameras, computer hacking technology and electro-magnetic devices—which were being arbitrarily and discriminately being used on or against citizens for their alleged purposes.

71. Mr. Showers contends that this organization was active against him and on his premises and that the Bay St. Louis police department was not interested in Mr. Showers' complaints and in detaining the intruders because Mr. Showers' home and camera devices were being used by this organization for their illegal purposes—and that the police department knew about the intruders onto Mr. Showers premises, because the officers involved in the illegal corporation were participant in and with the intruders onto Mr. Showers' premises.

72. Mr. Showers sent text messages to defendant DeNardo on his city owned cell phone in January 2016, just before DeNardo committed suicide revealing to DeNardo his, Mr. Showers' knowledge of the illegal corporation's existence and related to DeNardo that he, Mr. Showers was following up on news story investigation of other "illegal activity" going on in the city of Bay St. Louis police department.

73. The Bay St. Louis police department did not maintain all police and incident reports relative to Mr. Showers' reports to it regarding the intruders into his premises.

74. Mr. Showers was given only three (3) alleged reports from the twelve times he contacted the Bay St. Louis police department with new information regarding the intrusions into his home and requesting an investigation based on new information.

75. The Police Department gave Mr. Showers the reports in which the investigating officer-defendants herein assassinated his character by naming Mr. Showers as a mental case and a drug user—a description which later colored all aspects of Mr. Showers' Complaint and subsequent injuries resulting therefrom.

76. The narcotics task force used Mr. Showers' reports to set up a stake out of Mr. Showers' movements, to track his cell phone calls and internet media, instead of investigating drug paraphernelia existence at Mr. Showers' home and Mr. Showers' repeated complaints about same.

77. Mr. Showers contends that the defendants, acting under their individual capacities and in official capacity used Mr. Showers' case conspired with and under their High Warrants Corporation—instead of assisting Mr. Showers to catch the intruders, defendants conspired against Mr. Showers by using their sophisticated devices to listen in on Mr. Showers' cell phone conversations and interfere with/destroy his camera devices usefulness by using its electromagnetic devices—for their own illegal purpose and gain.

*Allegation of constitutional violations, failures of duties and negligence of defendants under color of law.*

78. Defendant's actions as claimed hereinabove were reckless and callously indifferent to Plaintiff's protected rights under the 4th amendment to the United States Constitution—not to be detained, restrained, arrested or otherwise have his freedom of movement

interfered with, absent reasonable and probable cause that the Plaintiff has committed a crime.

79. The forced commitment of Mr. Showers to the psychiatric hospital by defendant DeNardo, on behalf of the Bay St. Louis police department violated Mr. Showers' 4th amendment rights.

80. The conspiracy to maintain and color Mr. Showers' character as "drug using", "hallucinatory" and "suicidal" by the defendant's Bay Police Department, chief DeNardo and officers destroyed Mr. Showers' reputation and set into motion other constitutional violations.

81. Defendant's actions as claimed hereinabove were reckless and callously indifferent to Plaintiff's protected rights of free expression under the 1st amendment to the United States Constitution to report, complain or otherwise express his opinions to officials regarding violations of his rights, to demand as a taxpayer police protection and to report what he reasonably believed to be a conspiracy by the officers of the High Warrants Corporation to illegal violate his rights.

82. All of the defendants, with the exception of the intruders, were aware of the High Warrants corporation and its vigilante, illegal purpose, but took no action to protect Mr. Showers from its adverse impact on him, with their attempts just to make Mr. Showers incredible when he made his reports regarding illegal activity at City Hall and in the police department, specifically as to defendant chief DeNardo.

83. Defendant's actions were under color of law.

***Defendants' liability to Plaintiff.***

84. Defendants Mayor and City of Bay St. Louis are liable to the Plaintiff for the existence and maintenance of a pattern of failure to train and properly supervise its chief of police on carrying out police investigations and 'legal' involuntary commitment. These failures include, among others:

   a. Proper police report writing and reporting of citizen-officer contact regarding citizen complaints of being victimized by criminal conduct.

   b. Making assessment of citizen involuntary commitments and timeliness, assuring that all the statutory mandates are set forth—which were not in the case of Mr. Showers.

   c. Negligence on the part of the Narcotics task force defendants, Lois Gallo and James Burch to allow the existence of High Risks Warrants vigilante narc officers use repressive and fear mongering techniques against private citizens—tax payers, just for their personal enjoyment.

   d. Defendants Mayor, Chief of Police, Hancock County Sheriff all are negligent and liable for failing to train their officers on conducting investigations in home, gathering and evaluating evidence and remnants of possible crime or identity of perpetrators based on collection and use of forensic evidence—which was not the case with Mr. Showers evidence.

   e. Inadequate operation by defendant police officer, systemically, in using even minimum investigative criminal technique to obtain burglars and other intruders into citizens' homes before giving the file back as "unsolved".

   f. Conspiracy by and between all defendants, including tenant trespassers, who were being used by the defendant police officers to assist the High Warrants corporation to destroy Mr. Shower's character.

g.  City of Bay St. Louis, Mayor and Sheriff—all of these defendants knew of should have known of the prior propensity of chief DeNardo for personal and professional instability, for failure to be truthful in his representation, personal and official, as well as his instability when he believed his illegal activity was found out by his superiors.

h.  Defendants Mayor, Sheriff, and Narcotics directors and assistant directors allowed a pattern of vigilante justice to prevail in the county, knowing that their existence and actions were contrary to law and policies.

i.  Defendants City of Bay St. Louis, Mayor(s), and Sherriff failed to remove DeNardo before DeNardo committed irrevocable harm against Mr. Showers and before DeNardo committed suicide by failing to collect DeNardo's service weapons from him upon DeNardo's termination.

j.  All defendants, excluding defendant tenants failed to bring to justice the defendant tenants, who were observed by Mr. Showers onto his property without his permission and running from his property onto the street where one or both defendant tenants were picked up by one of the undercover narcotics vehicles Mr. Showers described as frequently trafficking in his neighborhood—a neighborhood where only two homes existed—Mr. Showers and one other.

k.  The defendants conspired to deprive Mr. Showers of his freedom of movement forcibly, in violation of constitutional protections afforded Mr. Showers to discredit and to silence Mr. Showers' investigation of DiNardo's illegal activity in the Bay St. Louis police department.

l. Silencing Mr. Showers would also silence his news reports, the press and media for which he worked and investigated claims of city officials misconduct and wrongdoing regarding taxpayer funds—was 1st amendment violation as wells.

m. Continuing to refuse to credit Mr. Showers' ongoing reported complaints of continuing intrusions is an act of revenge against Mr. Showers for making the reports in the first instance and then of linking the defendants into the conspiracy called the High Warrants corporation, an illegal vigilante group of officers and city officials are further examples of 1st amendment violations of Mr. Showers' constitutional rights by defendants acting individually and in official capacities with each other and independently—using their official positions—to violate the constitutional rights of Mr. Showers, ongoing.

### *Concurrent violations of tort law of defamation of character*

85. In addition to the 1983 and 1988 claims set forth above, Plaintiff claims that when the defendants Hendrix, initially, then DeNardo reported in a public record that Mr. Showers was mentally incompetent, drug user, hallucinatory, suicidal and or homicidal, that defendants Hendrix and DeNardo defamed Mr. Showers' character, reputation in his business and in the community, per se.

86. The immediate consequence to Mr. Showers that he lost his veteran's job as a WLOX news reporter while he was being held in the psychiatric hospital.

87. Mr. Showers could find no comparable employment in his home area, and when asked about his former employment, Mr. Showers is forced to relive and relate the forced commitment to which he was subjected by defendants herein.

**5.**

## PRAYER FOR RELIEF AND DAMAGES

For all act complained against herein, Mr. Showers prays for statutory relief, including injunctive and equitable and compensatory damages set forth:

1. Compensatory damages for all losses, including monetary and non-monetary; pain and suffering; loss of life's enjoyments; ongoing fear for life and safety in the amount of $7.5 million dollars;

2. Punitive damages for willful violations of constitutional rights and for conspiracy to cause Mr. Showers to suffer personal harm:  $7.5 million dollars.

3. Per se defamation of character, loss of employment and good reputation in the community—personally and professionally:  $1.5 million dollars.

4. Intentional Infliction of emotion distress-$7.5 million dollars.

5. Mr. Showers prays for defendants to be cited and summoned to answer herein within the legal delays afforded by law and afterward that there be judgment against the defendants as prayed, exoneration of the Plaintiff completely, award of damages prayed for herein to the Plaintiff, and trial by jury.

6/14/19

Respectfully submitted:

ALVIN SHOWERS, III, PRO SE
300 Blakemore Street
Bay St. Louis, MS  39520
Mobile: (850) 375-4419